# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT KNOXVILLE

### Assigned on Briefs March 27, 2019

## STATE OF TENNESSEE v. CHRISTOPHER CHRISTIAN PADGETT

### Appeal from the Criminal Court for Hamilton County
### No. 284433   Thomas C. Greenholtz, Judge

_____

### No. E2018-00447-CCA-R3-CD

_____

Defendant, Christopher Christian Padgett, was convicted for felony murder and especially aggravated robbery, and the trial court imposed an effective sentence of life in prison. On appeal, Defendant argues that the trial court erred when it allowed the State to introduce indirect hearsay evidence regarding an eyewitness's description of the suspect's shoes in violation of the rules of evidence and the Confrontation Clause. Additionally, Defendant argues that the trial court erred when it allowed the State to introduce a recording of Defendant's conversation with his mother taken at the police service center because the statements were taken in violation of Defendant's reasonable expectation of privacy protected by the Tennessee and United States Constitutions. After a review, we hold that the trial court committed harmless error by admitting the indirect hearsay description of the suspect and that Defendant is not entitled to plain error relief on the other issues raised. Thus, we affirm the judgment of the trial court, but we remand this case for entry of judgment documents in Counts Two and Four.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Remanded

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Lorrie Miller, Chattanooga, Tennessee (on appeal); Meredith Ziebold, Chattanooga, Tennessee, and Wencke West, Cleveland, Tennessee (at trial) for the appellant, Christopher Christian Padgett.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Neal Pinkston, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual and Procedural Background*

Defendant was indicted on July 11, 2012, by a Hamilton County Grand Jury for felony murder in Count One, first degree premeditated murder in Count Two, especially aggravated robbery in Count Three, and possession of a weapon with intent to commit a dangerous felony in Count Four. The Friday before the jury trial commenced, Defendant posted a $350,000 bond and was released with the special conditions of GPS and House Arrest Monitoring. On October 4, 2016, a four-day jury trial commenced, and the following evidence was adduced.

Mankin Mansur, an employee at Millennium Taxi, testified that Nathan Deere, the victim, came to work for the taxi company after Mr. Mansur encouraged him to leave his job at Waffle House to receive better pay. Mr. Mansur estimated that he and the victim spoke daily over the six to eight months that the victim was employed with Millennium Taxi. Explaining particular policies and procedures, Mr. Mansur stated that each driver must "pay a pack" of $95 each day by 6:00 p.m. to lease the van from the cab company. After the driver "pays the pack," additional money earned was for the driver to keep.

Furthermore, Mr. Mansur described that drivers typically picked up fares in two ways: base fares and special fares. Special fares occurred when a rider contacted the driver directly on the driver's cell phone and were not recorded in the log book. Mr. Mansur estimated that 60 to 65 percent of the calls originated from base fares and 35 to 40 percent of calls from special fares. In his experience, the majority of the transactions he made were in cash.

Mr. Mansur estimated that he spoke with the victim two hours before his death. The victim told Mr. Mansur that he had $95 to "pay his pack" and was on the way to pick up another ride. Mr. Mansur shared that he was not aware of exactly how much money the victim had in his possession when they spoke during the day, only that the victim stated he had enough to pay the $95 leasing fee.

Tierra Mosley, an eyewitness who lived on Ocoee Street the day of the shooting, observed a man get out of the back passenger seat of the cab, "[and] when he got out [of] the passenger side[,] he glanced back and took off running." She described the man as "a black skinny guy." Taking note of how long it had been since the shooting, Ms. Mosley said she could not remember exactly what the man was wearing, but thought it was a black or navy hoodie and blue jeans. Ms. Mosley did not see anyone else get out of the cab.

Hamilton County 911 received a call on April 18, 2012, that the driver of a blue, taxi-cab van located at 1643 Ocoee Street was injured or possibly deceased. Officer Clayton Smith from the Chattanooga Police Department was the first on the scene. He saw a blue van belonging to Millennium Taxi Cab Company with the passenger side door open. Officer Smith discovered an injured male victim inside the cab with what he believed to be a gunshot wound to the head. After securing the scene and calling for additional help, Officer Smith spoke with individuals on the scene. Anthony Pickett identified himself as the 911 caller. When interviewed, Mr. Pickett provided "unclear answers and refused to answer some questions." Officer Smith did not take Mr. Pickett in to the police station for questioning and did not speak to him again.

Joseph Montijo, a crime scene investigator for the Chattanooga Police Department, testified that he observed and photographed the scene but did not collect evidence from inside the cab because the team decided to transfer the vehicle to the police service center for processing in a more controlled environment. Investigator Matthew Puglise responded to the crime scene and deduced that the victim's phone was missing. Investigator Puglise got another officer to seek out an exigency warrant in order to get the GPS location of the victim's phone. Investigators utilized cell-tower ping location data to locate the victim's cell phone, and it was found around thirty meters (approximately 33 yards) from the crime scene. Investigator Montijo detailed that a trampled path heading northeast through the adjacent backyard was apparent on the night of the incident. The victim's cell phone was located on that path and collected by investigators for evidence and returned to the police service center for processing. Investigators also located a black, zip-up sweatshirt inside a bucket discarded along the same path and collected it for processing as well.

As the police delved further into the investigation, Sergeant Daniel Francis spoke to the dispatcher for Millennium Taxi to get more information about "where the victim had gone, who he'd picked up[,] and what his day had looked like prior to his death." Sergeant Russell Davis affirmed Mr. Mansur's description of the logbook as a place where Millennium Taxi kept track of any calls it received to the dispatcher: the number the person called from, who the person was, and the pick-up and drop-off locations. The only fares recorded in the logbook were the ones that went straight through Millennium Taxi's dispatcher, so when a passenger contacted the taxi driver directly, that was not recorded in the logbook. When Sergeant Francis reviewed the logbook, there were no entries around the time of the victim's death regarding the victim or a ride on Ocoee Street.

During his investigation, Investigator Puglise became aware that the victim had a "special fare," which means that the rider had contacted the victim directly for a taxi ride, just before the crime occurred. By examining the victim's phone record, the police determined that the "special fare" phone call had come from a number associated with

- 3 -

Defendant. Investigator Puglise called the phone number and asked for Defendant. Once a voice on the phone identified himself as Defendant, Investigator Puglise identified himself. Unprompted, Defendant said that he had lent his phone to another person earlier in the day. Investigator Puglise explained that he would like to talk to Defendant and asked for Defendant's whereabouts. Defendant gave him an address, and Investigator Puglise sent some officers to the address to pick up Defendant.

Defendant was not present at the address, but Defendant's mother eventually brought him to the investigators. Investigator Puglise and Investigator Montgomery conducted an interview of Defendant. The State introduced a recording of this interview at trial. The State proceeded to play portions of the interview where the investigators questioned Defendant, and Defendant continued to deny involvement in the crime. Defendant told the investigators that he had lent his phone to a friend who must have called the victim. Defendant also explained that he found a phone with a cracked screen during the day, but he claimed that he did not know that it belonged to the victim. Defendant maintained that he did not call the victim and that he never fired a gun on the day of the crime. Defendant did, however, mention that he had been shooting off fireworks with his friends. Defendant adamantly stated that he did not own any gray Jordan shoes. When the police showed Defendant the gray Jordan shoes recovered from Defendant's closet, Defendant admitted that they were his, but he maintained that he forgot about owning those shoes. When the prosecutor began playing a portion of the recording that contained statements made by Defendant's mother, defense counsel objected. The trial court responded, "The exhibit's already been admitted." Defense counsel said, "Well, we would object to the playing of his mother's statements." The trial court noted that the objection was untimely and allowed the prosecutor to continue playing the recording. During this portion of the recording, Defendant was asked probing questions by his mother. However, Defendant continued to deny any involvement in the crime and told his mother essentially the same account of the evening as he told the police moments earlier. After that portion of the recording was played, the prosecutor ended his presentation of the recording. Later, the prosecutor entered Defendant's handwritten statement as an exhibit and had Investigator Puglise read it aloud. Defendant's statement reads as follows, verbatim:

> When I woke up I took a shower and all that in got on Facebook and told cody to come get me so I started walking to the gas station that's when I seen cody I got in the car he dropped me off in boone heights that's when I see the little kids playing with fireworks so I stated playing with them to for a little bit then walked around for a while that's when I see a phone in the grass so I picked it up when I see it was messed up I threw it then I started walking I seen cadarrius I told him to take me to east lake so when I got in the car we rode around for a little while the he dropped me off in east lake it let jay use my fone then I walked off I went over tylers sister house charge

my fone then left in got dropped off in by wood lawns that's when I seen my mom.

In his handwritten statement and throughout the recorded interview, Defendant mentioned an individual named "Jay"[1] that borrowed his phone. Investigator Puglise was never able to locate or identify an individual named "Jay," but Investigator Puglise admitted on cross-examination that he never believed that an individual named "Jay" existed. Also on cross-examination, Investigator Puglise admitted that the victim's phone did not have a broken screen or other notable damage.

After his initial investigation at the crime scene, Investigator Montijo traveled to Erlanger Hospital to check on the victim and collect any necessary evidence. Investigator Montijo used swabs to collect physical evidence from the victim's hands and arms, specifically swabs for evidence of gunshot residue and swabs of the blood on the victim's arms and hands. Later at the police service center, Investigator Montijo photographed Defendant, collected Defendant's clothing to test for gunshot residue, and took several swabs of Defendant's hands and mouth for gunshot residue and DNA testing. At the time, Defendant was wearing a dark blue University of Michigan sweatshirt, jeans, and dark tennis shoes. Investigator Montijo received a pair of "gray white Nike hightops" from investigators who executed the search at Defendant's residence. The State admitted photographs of the Nike hightops into evidence without objection. Later in the trial, the State attempted to enter the specific shoes into evidence during Sergeant Francis's direct examination, and defense counsel objected on relevance grounds. The trial court admitted the shoes into evidence over the objection of Defendant.

The day after the shooting, Investigator Montijo processed the cab at the police service center and collected items and other physical evidence from inside. Despite the victim's wallet being found in the cab, there was no other cash located during the investigation. Next, Investigator Montijo utilized a gun-shot residue kit to collect any physical evidence from inside the cab. The cab was later processed completely for fingerprint and DNA evidence and four fingerprint cards were submitted for processing. Three of the four samples were sufficient to compare to both the victim and Defendant's fingerprints and were not a match to either and remained unidentified when run through a database. The fourth sample was not run through the database due to the detail of the fingerprint impression collected; however, it was also not identified as match to the victim or Defendant.

The Chief Medical Examiner, Dr. James Metcalfe, explained that the victim's death occurred on April 19, 2012, around 1:50 pm, less than 24 hours after he suffered a

---

[1] The trial transcript refers to this individual as "J."

gunshot wound to the right temple at approximately 5:50 pm. The autopsy indicated that the gunshot wound was the cause of death.

Special Agent Hunter Greene, a forensic scientist with the Tennessee Bureau of Investigation (TBI), testified as an expert regarding latent print analysis. He had examined latent prints collected from the U.S. currency totaling $76.45 found in Defendant's bedroom and the victim's cell phone found in the grassy area around 1700 Olive Street. Special Agent Greene determined that the prints found on the currency failed to show "enough detail for [him] to make a comparison." When testing the victim's cell phone, Special Agent Greene described that the non-porous surface of the cell phone and its battery provided some evidence of ridging from latent prints, but these prints were also not sufficient enough to make any kind of comparison or "reveal the presence of identifiable latent prints."

Dr. Laura Boos of the TBI's forensic biology section testified about the DNA testing conducted in this case. Defendant's DNA profile did not positively match any of the samples taken from the crime scene. Additionally, James Davis from the microanalysis unit at the TBI testified that he analyzed various items for gunshot primer residue. The hand swabs of both Defendant and the victim tested negative for gunshot primer residue. Special Agent Davis tested one sample from the victim's taxi cab, and a sample from the right rear passenger seat tested positively for gunshot primer residue. No more samples from the taxi cab were tested because Special Agent Davis indicated that they would not have been helpful from crime scene reconstruction. Special Agent Davis tested various articles of Defendant's clothing for gunshot primer residue, and only Defendant's blue jeans tested positively for gunshot primer residue. From this, Special Agent Davis concluded that Defendant's blue jeans "were being worn by someone when a weapon was fired, or they came in contact with that weapon, or with a fired cartridge case." Special Agent Davis specifically stated that the gunshot primer residue material that was found on Defendant's blue jeans was not consistent with residue that would be left on clothing from shooting fireworks. Also, Special Agent Davis did not find any material on Defendant's clothing that would be consistent with residue from shooting fireworks.

Mark Hamilton, a cellular signal analyst with the Chattanooga Police Department, testified about the approximate location of Defendant's cell phone and the victim's cell phone at times relevant to the shooting. Initially, the phones were located in different areas of Chattanooga, but after Defendant's phone made two calls to the victim's phone, the victim's phone began to move. At 5:35 p.m., Defendant's phone and the victim's phone were located in the same area. Then, Defendant's phone and the victim's phone both moved together. Mr. Hamilton elaborated by stating, "I can't say with certainty they're together but they're very likely very close because of the timing. They would have to both be traveling basically following each other." The phones continued to move

together until they reached the approximate location of the shooting. Defendant's phone and the victim's phone were in the same area at the time of the shooting. At 5:43 p.m., the victim's phone made its last communication with a cellular tower. At 5:50 p.m., police received a 911 call about the shooting. Defendant's phone continued to show activity and did not remain in the same location. After the police called Defendant, Defendant's phone ceased communication with the network, which could result from the phone dying or someone removing its battery.

After the close of the State's case-in-chief on the second day of trial, Defendant violated the conditions of his bond and failed to appear in court on the third day of trial. Following a jury-out hearing, the trial court found that Defendant was voluntarily absent, without cause, and proceeded with trial in Defendant's absence. *See* Tenn. R. Crim. P. 43(6)(1). Defense counsel rested without offering proof. The State was permitted to re-open proof to offer testimony regarding Defendant's violation of the conditions of his bond. Defense counsel moved for a mistrial because of Defendant's absence and the motion was denied.

After reopening its proof, the State called Chris Jackson, the director of corrections at Hamilton County Corrections, to testify about the monitoring of Defendant. Mr. Jackson's department began monitoring Defendant on the Friday before Defendant's trial. As an essential part of the monitoring process, a GPS ankle monitor was affixed to Defendant's leg. Hamilton County Corrections continuously monitored Defendant's whereabouts until the morning of the third day of trial. On that morning at 1:41 a.m., Defendant's ankle monitor sent out a notification that it had been tampered with, but Mr. Jackson did not read the notification until around 6:00 a.m. He eventually spoke with Defendant's mother on the phone. As a result of his conversation with Defendant's mother, Mr. Jackson contacted the District Attorney's Office and Key Bonding Company. Eventually, Defendant's mother brought the ankle monitor to Hamilton County Corrections, and Mr. Jackson perceived that the band which held the monitor on Defendant's leg had been cut. At the time of his testimony, Mr. Jackson did not know Defendant's whereabouts.

Officer Mark Pollard with the Chattanooga Police Department testified that he reported to Defendant's residence and spoke with Defendant's mother on the morning that Defendant absconded. Defendant's mother told Officer Pollard that Defendant had cut off the ankle monitor and run away from the house. Law enforcement officers searched the area surrounding Defendant's residence and could not locate him.

After all of the proof had been presented, the jury convicted Defendant on Counts One and Three, felony murder and especially aggravated robbery. Counts Two and Four

were dismissed upon motion by the State.[2]   Pursuant to Tennessee Code Annotated section 39-13-208(c), the trial court announced Defendant's automatic life sentence for the felony murder conviction, and following a sentencing hearing, Defendant was ordered to serve fifteen years concurrently for his especially aggravated robbery charge. Defendant's motion for a new trial was denied on May 15, 2017, and he subsequently filed this timely appeal.

*Analysis*

*I.  Hearsay*

Defendant argues that the trial court erred by admitting hearsay evidence that asserted the suspect was wearing a pair of gray shoes.  The State claims that the statements were non-hearsay because the statements were not being offered for the truth of the matter asserted but rather to explain why police officers confiscated the shoes. Alternatively, the State argues that if the statements are found to be hearsay, their admission was harmless.  We agree with the State's alternative argument.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c).   Generally, hearsay is inadmissible absent an applicable exception. Tenn. R. Evid. 802.  However, out-of-court statements offered to show the effect on the listener, but not the truth of the matter asserted, are admissible as definitional non-hearsay.  *See* Neil P. Cohen et al., *Tennessee Law of Evidence*, § 8.01[7] (6th ed. 2011).

"The standard of review for rulings on hearsay evidence has multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015).  First, a trial court must determine if a statement is hearsay.  *Id.*   If the statement is hearsay, then the trial court must determine if it fits within one of the exceptions.  *Id.*  A trial court may need to receive evidence and hear testimony to make these determinations.  *Id.*  The trial court's factual and credibility findings made during the course of ruling on an evidentiary motion "are binding on the reviewing court unless the evidence in the record preponderates against them."  *Id.*  "Once the trial court has made its factual findings, the next questions — whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule — are questions of law subject to de novo review."  *Id.* (citing *State v. Schiefelbien*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)).

---

[2]   The record on appeal contains no judgment documents for Counts Two and Four, but a Minute Entry filed on April 25, 2017, indicates that Counts Two and Four were dismissed.  On remand, the trial court should enter judgments forms reflecting the dismissal of these counts.  *See State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015) (citing Tenn. R. Crim. P. 32(e)(3)).

In order for a statement to be hearsay, it must meet two requirements. *See* Tenn. R. Evid. 801(c). First, it must be "a statement, other than one made by the declarant while testifying at the trial or hearing." *Id.* Second, and most importantly for this case, the statement must be "offered in evidence to prove the truth of the matter asserted." *Id.* With every hearsay objection, there must be a determination by the trial court of whether the statement which is the subject of the objection meets the two parts of the hearsay definition.

The following exchange between the prosecutor and Sergeant Francis is the basis for Defendant's first argument on appeal:

STATE: And why did you collect – you collected some gr[a]y tennis shoes; is that correct?

SERGEANT FRANCIS: Correct.

STATE: Why did you feel like it was important to collect the gr[a]y tennis shoes?

SERGEANT FRANCIS: They matched the suspect['s] description that's seen leaving the scene.

STATE: What do you mean?

SERGEANT FRANCIS: The suspect –

DEFENSE COUNSEL: How is that not hearsay, Judge?

COURT: Well, I don't think this part is being offered for the truth of the matter asserted. I believe that this testimony is being offered to establish the relevance of the piece of evidence that was collected. And so to the extent that there's a hearsay objection, I'll overrule that very respectfully.

STATE: Okay. So there was a witness on the scene; is that correct?

SERGEANT FRANCIS: Correct.

STATE: What did the witness say the suspect was wearing as far as shoes?

DEFENSE COUNSEL: Object to hearsay, Judge.

COURT: Overruled.

STATE: What did the witness say the suspect was wearing as far as [shoes]?

SERGEANT FRANCIS: A pair of Jordans.

STATE: Did the witness say whether or not what color these Jordans were?

SERGEANT FRANCIS: I believe they advised black and gray.

STATE: And that's why you collect the gray Nike Jordans from [Defendant's] room.

SERGEANT FRANCIS: Correct.

Defendant argues that the State presented indirect hearsay when the prosecutor asked, "Why did you feel like it was important to collect the gr[a]y tennis shoes?" and Sergeant Francis responded, "They matched the suspect['s] description that's seen leaving the scene." Obviously, the jury can infer from the question and answer that a witness stated that the suspect was wearing gray shoes. The *Tennessee Law of Evidence* treatise explains indirect hearsay and provides a classic example of indirect hearsay:

> Sometimes witnesses, especially police, are tempted by lawyers to get in hearsay through the back door.
>
> Q. After talking to the informant – and don't tell the jury what the informant told you – what did you do?
>
> A. I went to the luggage room, found the red suitcase with the defendant's name on it, and found cocaine inside.
>
> Most jurors will get the message intended from this indirect hearsay. They will have learned what the informant said, even though no words from the informant were actually repeated. The testimony is hearsay and inadmissible; courts should close such back doors. This testimony should be permitted only if the effect on the listener is somehow relevant. For example, in the above hypothetical if the issue is whether the officer had probable cause to search the suitcase in the luggage room, the evidence would not be hearsay. It would be used to prove the effect on the listener, not the truth of the informant's statement.

Neil P. Cohen et al., *Tennessee Law of Evidence*, § 8.01[11][b] (6th ed. 2011). In *State v. Lloyd Rush Pratt, Jr.*, this Court found indirect hearsay in the following exchange:

> [State]: Okay. And based on your investigation, you testified that [Defendant] was the driver. Was that what you determined?
>
> [Trooper Allen]: Yes, I did come to the conclusion that he was the driver.
>
> [State]: Okay. And what was that conclusion based on?
>
> [Trooper Allen]: Statement that was told to me by the – by the passenger and by the sheriff. . . .

No. M2017-01317-CCA-R3-CD, 2018 WL 4005390, at *9 (Tenn. Crim. App. Aug. 20, 2018), *no perm. app. filed*. In *State v. Robert Spencer*, this Court explained the scenario where it found indirect hearsay by stating:

> Agent Flint's testimony was able to relay what the "cooperating source" had told him about the house on Olympic Street and the Defendant in an indirect way. Agent Flint's testimony that the house and the Defendant matched the descriptions provided by the source coupled with his testimony about his background in narcotics investigations allowed the jury to learn what the source told Agent Flint, that the Defendant was selling cocaine from the house on Olympic Street.

No. W2014-02454-CCA-R3-CD, 2016 WL 325460, at*4 (Tenn. Crim. App. Jan. 27, 2016), *perm. app. denied* (Tenn. June 24, 2016). In this case, like the examples above, Sergeant Francis impliedly relayed an eyewitness's statement to the jury – that the suspect was wearing gray shoes.

This implied message is made even more clear when the prosecutor directly asked Sergeant Francis, "What did the witness say the suspect was wearing as far as [shoes]?" He replied, "A pair of Jordans." The prosecutor further probed, "Did the witness say whether or not what color these Jordans were?" Sergeant Francis responded, "I believe they advised black and gray." The prosecutor said, "And that's why you collect[ed] the gray Nike Jordans from [Defendant's] room." "Correct," said Sergeant Francis. Clearly, both directly and indirectly, the State offered an out-of-court statement by someone other than Officer Francis that asserted the suspect was wearing a pair of "gr[a]y tennis shoes" or a pair of black and gray Jordans.

In order for a direct or indirect statement to be hearsay, it must have been offered for the truth of the matter asserted. Thus, as a part of our hearsay analysis, we must

discern the purpose for which the statement is being offered. The context of the question and answer reveals its purpose. At trial, defense counsel objected to the relevance of a pair of gray shoes, and the prosecutor was attempting to lay the foundation to establish the relevance of the gray shoes when he elicited the aforementioned statement, both directly and indirectly. In sum, we are presented with a scenario where potential hearsay statements are being used in an attempt to lay the foundation for the admissibility of a piece of physical evidence.

The problem is that for the statement to have any probative value in the analysis of the relevancy of the gray shoes, the matter asserted in the statement (the color of the suspect's shoes) must be true. Unlike the example provided in *Tennessee Law of Evidence* where the indirect statement established the officer's probable cause to conduct a search, Sergeant Francis's reason for collecting the shoes during a search of Defendant's room has absolutely nothing to do with the relevancy of the gray shoes, themselves, at trial. In order to be treated as non-hearsay, the statement would have to have some probative value outside of the truth of the matter asserted therein. Here, the statement would only be relevant if it was true, and thus, the statements do not have any probative value outside of their truthfulness. Said another way, there is no probative value in the mere fact that the statement was made. In short, it is inadmissible hearsay.

However, error by the trial court does not automatically entitle Defendant to relief. A defendant is entitled to relief from a non-constitutional error only if it "more probably than not affected the judgment or would result in prejudice to the judicial process." *State v. Rodriquez*, 254 S.W.3d 361, 374 (Tenn. 2008). The indirect hearsay statement linked Defendant's possession of a pair of gray shoes with a description that the suspect was wearing gray shoes. We view this connection as weak and tenuous, at best. In our assessment, there was other evidence that provided a much stronger connection between Defendant and the crime. The victim's phone records revealed a call from Defendant prior to the victim's death, Defendant's cell phone was in the same approximate location as the victim's cell phone at the time of the shooting, and Defendant had gunshot residue on his pants. We cannot conclude that the dubious connection made through the gray shoes more probably than not affected the judgment or resulted in prejudice to the judicial process. The error was harmless.

## II. Confrontation Clause

Defendant also contends that the admission of the aforementioned indirect hearsay was a violation of his right to confront the witnesses against him under the Fourteenth Amendment of the United States Constitution and Article I, section 9 of the Tennessee Constitution. The State claims that Defendant has waived this issue and does not address its merits in its brief. We agree with the State that the issue is waived, but we will review for plain error.

Defendant objected to the statement on hearsay grounds, but he did not argue that the statement was inadmissible on confrontation clause grounds. Also, Defendant did not argue that the statement was inadmissible on confrontation clause grounds in his motion for new trial. "It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal." *State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) (citing *State v. Barnes*, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993). Therefore, the issue is waived.

When an issue is waived, we are limited to plain error review. *State v. Jordan*, 325 S.W.3d 1, 57 (Tenn. 2010). Our supreme court has succinctly described the discretionary nature of the plain error doctrine as follows:

> In criminal cases, the doctrine of plain error permits appellate courts to consider issues that were not raised in the trial court. [Tennessee Rule of Appellate Procedure] 36(b), the codification of the plain error doctrine, states in part that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." We have cautioned, however, that the discretionary authority to invoke the plain error doctrine should be "sparingly exercised," *State v. Bledsoe*, 226 S.W.3d [349,] 354 [(Tenn. 2007)], because "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbitrators of legal questions presented and argued by the parties before them." *State v. Northern*, 262 S.W.3d [741,] 766 [(Tenn. 2008)] (Holder, J., concurring and dissenting) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)).

*State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014). To determine whether a trial error rises to the level of justifying "plain error" review, we look to the following five factors:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Bishop*, 431 S.W.3d at 44. Even if all five factors are

present, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Id.* (quoting *Adkisson*, 899 S.W.2d at 642).

Defendant's brief contains no mention of plain error analysis, and he does not expressly address any of the plain error factors. Defendant bears the burden of persuading this Court that the trial court committed plain error and that the error probably changed the outcome of the trial. *See State v. Martin*, 505 S.W.3d 492, 505 (Tenn. 2016). Here, Defendant has not carried his burden of persuasion because Defendant did not establish enough facts for us determine whether the hearsay statement was testimonial. *See Crawford v. Washington*, 541 U.S. 36, 59 (2004). The multi-factor test first found in *State v. Maclin*, 183 S.W.3d 335, 349 (Tenn. 2006) and restated in *State v. Lewis*, 235 S.W.3d 136, 143 (Tenn. 2007) is still relevant to our determination of whether a statement is testimonial, though it is not an exhaustive list of considerations that ought to be applied mechanically. *State v. Franklin*, 308 S.W.3d 799, 818 (Tenn. 2010). Those factors include the following:

> (1) whether the declarant was a victim or an observer; (2) whether contact was initiated by the declarant or by law-enforcement officials; (3) the degree of formality attending the circumstances in which the statement was made; (4) whether the statement was given in response to questioning, whether the questioning was structured, and the scope of such questioning; (5) whether the statement was recorded (either in writing or by electronic means); (6) the declarant's purpose in making the statements; (7) the officer's purpose in speaking with the declarant; and (8) whether an objective declarant under the circumstances would believe that the statements would be used at a trial.

*Lewis*, 235 S.W.3d at 145 (citing *Maclin*, 183 S.W.3d at 349). Of those factors, the proof in this case only allows us to consider factor (1) because we know the indirect statement came from an observer. There is simply no evidence which pertains to the remainder of the factors. Therefore, we are unable to discern whether the statement was testimonial, and likewise, Defendant has failed to prove that a clear and unequivocal rule of law was breached.

For the same reason that the hearsay error is harmless, Defendant cannot show that his alleged confrontation clause violation was of such a great magnitude that it probably changed the outcome of the trial. The other evidence tying Defendant to the crime is much stronger than the connection via the gray shoes. For these reasons, Defendant is not entitled to plain error relief.

### III. Recording of Defendant's Conversation with his Mother

Defendant claims that he had a reasonable expectation of privacy in his conversation with his mother in the police interview room, and thus, the recordings of those statements should be subject to the exclusionary rule because they were obtained in violation Fourth Amendment of the United States Constitution and Article I, section seven of the Tennessee Constitution. The State contends that Defendant waived consideration of the issue by failing to lodge a timely objection and that Defendant is not entitled to plain error review. We agree with the State.

We stress the importance of a timely objection. "This court is extremely hesitant to put a trial court in error where its alleged shortcoming has not been the subject of a contemporaneous objection." *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Failure to contemporaneously object constitutes a waiver of the issue on appeal. *State v. Chad Lewis Monette*, No. M2006-02462-CCA-R3-CD, 2008 WL 4211602, at *3 (Tenn. Crim. App. Sept. 4, 2008), *perm. app. denied* (Tenn. Feb.17, 2009); *See* Tenn. R. App. P 36(a). Here, the record reveals that the prosecutor informed defense counsel of the sections of the recording that the prosecutor intended to play at trial, and prior to the admission of the recording, the prosecutor said, "I intend to admit the entirety of the recording, which is significant." The trial court asked defense counsel, "Any objections?" "No, Judge," responded defense counsel. During further discussion about the recording, the prosecutor said,

> There are portions of the recording where the interview is not taking place. I've provided those portions or timed those portions, provided those to the defense counsel, and I intend to admit the entirety of the recording, which is significant. But I intend to skip through those times where the interview is not taking place.

Again, the trial court asked, "Any objection?" "No, Judge," replied defense counsel. Defendant has not alleged any discovery issues. So, we presume defense counsel had access to the recording and knew the contents of the entire recording. Thus, the point at which the entire recording was offered as an exhibit would have been the proper time to object to any specific portions of the recording. Defense counsel waited until the prosecutor played the portion of the recording showing Defendant's conversation with his mother before objecting. The objection was untimely, and this issue has been waived.

We are confined to plain error review of this issue, and we will review the issue according to the above-listed principles. We decline this opportunity to delve deeply into the nuance of Fourth Amendment jurisprudence and whether a reasonable expectation of privacy attaches to a conversation with a family member in a police station because, ultimately, any error was not of such great magnitude that it probably changed the outcome of the trial. Throughout that portion of the recording, Defendant maintains his innocence in the face of probing questions from his mother. From our perspective,

Defendant's statements to his mother do not differ significantly from his earlier statements to the officers such that they could have been used for impeachment. On the spectrum between innocence and guilt, this evidence would not even move the needle. This is especially the case where other evidence directly tied Defendant to the crime, and the Defendant's guilt was strongly implied by his absconsion in the middle of the night and absence on the second day of trial. Defendant is not entitled to plain error relief on this issue.

## Conclusion

For the aforementioned reasons, the judgment of the trial court is affirmed. However, we remand this case for entry of judgment documents reflecting the dismissal of Counts Two and Four. *See State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015) (citing Tenn. R. Crim. P. 32(e)(3)).

_____
TIMOTHY L. EASTER, JUDGE